R. C. DeSalme and Lucille DeSalme (Plaintiffs), Respondents, v. Union Electric Light & Power Company, a Corporation (Defendant), Appellant, Dudley Sanford and Thomas Higgins, Defendants.—102 S. W. (2d) 779.

St. Louis Court of Appeals. Opinion filed March 2, 1937.

246

*E. McD. Stevens* for respondents.

*A. E. L. Gardner* and *Thomas Bond* for appellant.

BENNICK, C.—This is an action for the damages sustained by plaintiffs by reason of defendant's alleged wrongful discontinuance of electric service to them. The verdict of the jury was for plaintiffs for actual damages of $2,475 and punitive damages of $1; and from the judgment rendered in conformity therewith, defendant's appeal to this court has been perfected in the usual course.

Plaintiffs are the owners of a tract of land located at the junction of Saline and Gravois roads in St. Louis county, the same being improved by a frame house, a garage, and a shed originally used as a blacksmith shop. Since the time of their purchase of the property plaintiffs have continuously made use of it as a residence except for certain periods in the winter months when they have temporarily occupied a furnished apartment in the city.

In the early part of 1927 one of the power lines of defendant Union Electric Light & Power Company was built out to the vicinity of plaintiffs' property, whereupon plaintiffs contracted with defendant for the running of an extension into their property so as to permit them to receive electric service. It appears that under the terms of such agreement plaintiffs deposited with defendant the sum of $201.25 as a portion of the cost of making the connection, but with the understanding that such deposit would be subsequently refunded to them as other new customers should begin to receive service from the extension.

On April 27, 1927, defendant began supplying electric service to plaintiffs under the agreement aforesaid, and continued the same without interruption or complaint for one month, or until the following May 27th, when some difficulty arose at the time of the second reading of the meter. Defendant's evidence was that its meter reader, one Thomas Higgins, found a ''jumper'' or device attached to the terminals of the meter in such a manner as to prevent the registering of the current used by plaintiffs, and that upon his report to defendant of what he had found the latter discontinued the service after having first given plaintiffs the usual notice by registered mail. Plaintiffs for their part strenuously denied the truth of Higgins' report except as to the fact that either he or some other employee of defendant had come to their home on the occasion in question for the purpose of making the customary reading of the meter.

Defendant argues that inasmuch as Higgins bore a good reputation with the company and had no apparent reason to have wished to do plaintiffs an injustice, it was entitled to rely upon his report and to take the position, as it did, that unless plaintiffs would pay the estimated cost of the unmetered current and the cost of

the installation of a lock box for subsequent use their service would not be restored to them. Plaintiffs refused to comply with these conditions which were obviously based upon the assumption that they had been guilty of the theft or diversion of current as charged by Higgins in his report, and on May 7, 1928, upon the advice of counsel, filed a formal complaint with the Public Service Commission, alleging therein that defendant had discontinued electric service to them without just cause, and praying for an order on defendant requiring it to restore such service.

At the hearing before the commission the company defended purely upon the question of the jurisdiction of the commission to entertain the complaint on the merits, its then counsel having not only advised it that the commission was without jurisdiction to adjudicate a current theft case for the reason that the same presented a judicial question which required the exercise of judicial rather than administrative powers, but having also recommended that the particular complaint be made a test case by which to establish the fact that jurisdiction over such type of cases was vested solely in the courts and not in the commission.

The commission not only ruled that it had jurisdiction over the complaint but also ordered that service be restored to plaintiffs, whereupon defendant sued out a writ of *certiorari* in the circuit court for the purpose of having the lawfulness of the order and decision of the commission inquired into and determined. After a hearing the circuit court affirmed the commission, from which judgment of affirmance defendant perfected its appeal to the Supreme Court, wherein, in division, but with one judge dissenting, the judgment of the circuit court was affirmed. The case was then transferred to the court en banc, but before its determination the appeal was dismissed by defendant's general counsel, and service was restored to plaintiffs in accordance with the order and decision of the commission.

In their petition plaintiffs set out the facts of the case about as we have heretofore detailed them, and charged that in discontinuing electric service to them, in refusing to obey the order of the Public Service Commission that service be restored to them, and in litigating the matter in the courts to the point where it voluntarily dismissed its appeal, defendant had acted wrongfully, maliciously, and without just cause or excuse.

Concluding their petition, plaintiffs alleged that by reason of all such conduct on defendant's part they had been damaged and injured in their business, property, and livelihood; that their ability to rent their property and to derive a revenue therefrom had been damaged and destroyed; and that the fair and actual rental value of their property had been damaged and depreciated to the extent of $1,500 a year for the years from 1927 to 1930 inclusive, and to the

extent of $375 during the year 1931 up to the time when service was restored to them.

Judgment was prayed for actual damages of $6,375, and punitive damages of $30,000.

In its amended answer defendant alleged that both by law and under the rules and regulations of the Public Service Commission, it had the right to discontinue the service of any customer if it discovered that such customer's meter was being tampered with so as to prevent the total amount of current used from registering on the meter, and that in discontinuing the service to plaintiffs under what it claimed to be the circumstances of the case it had acted rightfully and without malice and for the sole purpose of protecting its revenues and preventing an unjust discrimination in favor of plaintiffs as against other customers.

The record indicates that technically there was no reply filed to defendant's answer as finally amended, but at any rate the case was tried upon the theory that the charge that plaintiffs had tampered with their meter by making use of the "jumper" was expressly denied and in issue.

The chief controversy on this appeal seems to turn upon the question of the proper measure of plaintiff's actual damages, if any, under the pleadings and evidence in the case. Plaintiffs' theory, as exemplified in their instruction No. 1, was that in the event of a verdict in their favor they should be awarded such sum as the jury might find and believe from all the evidence would fairly and reasonably compensate them for the depreciation, if any, in the reasonable rental value of their property during the period of time that service was illegally withheld from them.

In fact, not only did plaintiffs base their instruction upon the theory that the depreciation in the rental value of their property should be the measure of their actual damages, but also that in determining such rental value the jury should have regard for the use for which the property, by reason of its location, was shown to have been most available and valuable, which was as "a restaurant and resort for motorists."

Defendant argues that inasmuch as plaintiffs were shown to have used their property solely for residential and not for rental purposes, it was highly prejudicial to make the depreciation in rental value the criterion for the determination of their actual damages, and particularly so in view of the fact that the discrimination, if any, in the matter of supplying current was purely personal to plaintiffs themselves, and could not have amounted to an injury to their property so as to have affected its value in the hands of any responsible tenant who could have secured service from defendant upon the making of an application for it.

The nature of the case considered, we cannot escape the con-

clusion that defendant is right in its contention that a wrong measure of damages was submitted in the instruction in question.

In 20 C. J. 339, 340, it is said that "in accordance with the general rules as to damages for torts or breaches of contract, compensation for the actual loss proximately caused thereby is the measure of damages for a wrongful failure or refusal to supply electric current." It happens that reported cases of this general character are few in our State, and yet in such as have made their way to the appellate courts, whether in tort or in contract, it seems to have been taken for granted that in the event of the plaintiff's recovery, the defendant's liability to respond should be measured by the extent of the damages naturally resulting from its wrong. [Gardner v. Springfield Gas & Electric Co., 150 Mo. App. 676, 677, 135 S. W. 1023; Hesse v. Imperial Electric Light, Heat & Power Co., 160 Mo. App. 431, 435, 140 S. W. 911; Ellyson v. Missouri Power & Light Co. (Mo. App.), 59 S. W. (2d) 714, 717.]

It may well be true that in the ordinary action for the recovery of the damages resulting from a temporary injury to property, by which is meant an injury of a character to be wholly abatable or remediable, the resulting depreciation in the fair and reasonable rental value of the property will be taken, in part at least, as the measure of the plaintiff's damages. What the law aims at in every case is reasonable compensation to the injured party, and it is obvious that in attaining that end the same considerations which, in the case of a permanent and irreparable injury to the land, make the depreciation in its market value the test, should likewise make it practical and expedient that in the case of but a temporary and remediable injury affecting nothing but the use and enjoyment of the property for the time being only, the depreciation in rental value should be the test. [Adam v. Chicago, B. & Q. R. Co., 139 Mo. App. 204, 207, 122 S. W. 1136.]

Nor, in the ordinary case, will the proper application of such rule be avoided by the fact that the owner of the property was himself the occupant of it at the time and during the continuance of the temporary injury. This, of course, for the reason that along with whatever items of special damage there may be, it is the defendant's wrongful interference with the full use and enjoyment of the property which is to be compensated for, and, theoretically at least, the value of such use and enjoyment is the same whether the owner himself occupies his property or elects to rent it out to some one else.

But the rule making the depreciation in the rental value of property the criterion for determining the measure of the damages resulting from a temporary injury to it necessarily presupposes and contemplates an injury of such a tangible or determinable character

as to affect the value of the use and enjoyment of the premises no less if occupied by a tenant than if occupied by the owner.

Such a situation, however, is one which could obviously not obtain under the particular facts of the case at bar. Here defendant's discontinuance of plaintiffs' service was based purely upon a personal ground, that is, upon the assertion, whether true or not, that plaintiffs had been guilty of tampering with their meter so as to have forfeited their right to demand and receive service from defendant. We grant that the discomfort and inconvenience attending the discontinuance of service might well have affected the value of the use and enjoyment of the property, but only when it was occupied by plaintiffs themselves. Even after further service was discontinued by defendant the premises remained wired for electricity, and if the premises had been thereafter let out by plaintiffs to any responsible tenant, not only would defendant have undoubtedly been willing, but as a public utility it would have been required by law, to supply service to that tenant, who could in no event have been penalized because of any wrongful conduct on plaintiffs' part. Thus it is apparent that the discontinuance of service to plaintiffs could not be fairly said to have affected the rental value of the property, and in fact plaintiffs' own expert witness on rental values admitted that if any tenant who migh rent the property could get service upon his application to defendant for it, then the question of depreciation of rental value would not be a proper test of the damage done to plaintiffs themselves.

It follows, therefore, that because of the submission of the improper measure of damages in plaintiffs' instruction No. 1, the judgment of the lower court must be reversed and the cause remanded for such further proceedings as the state of the record and the legitimate possibilities of the case may require.

In this connection defendant argues that with the question of rental value eliminated from the case, the pleadings and proof would warrant the recovery of no more than nominal damages, and it insists, therefore, that the case should be remanded with directions to the lower court to enter up a judgment for plaintiffs, but for nominal damages only. With this suggestion we cannot agree as the case now stands before us.

Nominal damages are to be awarded only on those rare instances where a legal wrong has been done, but either no actual damage has resulted from it or else the same is for some reason or other incapable of ascertainment. Here plaintiffs have already pleaded that by reason of the discontinuance of service to them they "were damaged and injured in their business, property, and livelihood." At this stage of the case we are in no position to say what proof they may be able to bring forward upon the question of the damages actually sustained by them as the result of defendant's act in dis-

continuing their service. They may have suffered a substantial pecuniary loss as the averment of there petition would seem to indicate, or their damage may conceivably have been so intangible and problematical as to be wholly incapable of ascertainment under the rules of evidence. The important thing is that whether the one or the other situation exists is a question which cannot be answered on the record before us, but must await its determination upon a retrial of the case conducted and submitted upon the proper theory. [Hesse v. Imperial Electric Light, Heat & Power Co., supra.]

This brings us then to the final point for our consideration, which is that of the disposition to be made of the case upon the issue of punitive damages.

As to this defendant argues that there is no evidence in the record entitling plaintiffs to an award of punitive damages in any sum, but that if we should perchance disagree with it in its conclusion upon this feature of the case, then in any event the issue of punitive damages should be considered as having been settled and concluded by the jury's verdict at the trial now under review, and the scope of the retrial of the case should be expressly limited by us, in so far as the question of damages is concerned, to the issue of the actual damages, if any, to be awarded.

As constituting the basis for the allowance of punitive damages, there must not only have been a wrongful act done by the defendant, but it must have been done with a bad motive, or with negligence amounting to positive misconduct, or in a manner evincing willful disregard of the rights of others. [Schafer v. Ostmann, 148 Mo. App. 644, 129 S. W. 63.] In other words, the defendant's act must have been of a nature to be properly characterized as wanton or malicious, not necessarily the product of spite or ill will towards the plaintiff personally, but intentionally done without just cause or excuse. [Lampert v. Judge & Dolph Drug-Co., 238 Mo. 409, 141 S. W. 1095; Jones v. West Side Buick Auto Co. (Mo. App.), 93 S. W. (2d) 1083.]

In this case defendant's act in discontinuing service to plaintiffs was unquestionably wrongful and without just cause or excuse if plaintiffs were not as a matter of fact guilty of tampering with their meter so as to have prevented it from registering the full amount of current used on the premises. Moreover, if plaintiffs' evidence is to be believed, defendant did not content itself with merely exercising what it might have felt to be its legal right to discontinue plaintiffs' service in the light of the report of Higgins, its meter reader, but instead proceeded in utter disregard of the rights and feelings of plaintiffs by addressing them, through the mouth of Sanford, its assistant treasurer, as "thieves" who "ought to be in jail in place of walking the streets with decent people." It is true that Sanford denied the use of any such language, but this means no more than

that upon conflicting evidence the issue of whether his attitude towards plaintiffs was wanton and oppressive was one for the jury to determine.

Nor is defendant to be allowed to exculpate itself as a matter of law by its claim that it had the right to rely upon the truth of Higgins' report, regardless of the injury that may have been done to plaintiffs thereby. We say this for the reason that Higgins, in making his report of what he found upon his inspection of plaintiffs' meter, was engaged in the performance of a matter specifically intrusted to him by defendant as a part of his employment, so that in legal contemplation his act was that of defendant itself. [Haehl v. Wabash R. Co., 119 Mo. 325, 24 S. W. 737; Daniel v. Phillips Petroleum Co., 229 Mo. App. 150, 73 S. W. (2d) 355; Hinson v. Morris (Mo. App.), 298 S. W. 254.]

But regardless of the sufficiency of the evidence to have made a prima facie case for the allowance of punitive damages, such issue must likewise be retried along with the other issues in the case. There are instances, of course, where the different issues in a case may be so unrelated and so independent of each other that the retrial of the particular issues in connection with which error was committed will not require the retrial of the remaining issues already satisfactorily tried and disposed of. However no such situation obtains in the case at bar with respect to the award of punitive damages for the reason that the same was peculiarly dependent for its legal efficacy upon the existence of the award of actual damages. [Carnes v. Thompson (Mo.), 48 S. W. (2d) 903.] With plaintiffs deprived of their judgment for actual damages, the finding upon the issue of punitive damages has no further basis on which to stand, and that issue must therefore be retried along with the issue of actual damages.

For the error noted the judgment rendered by the circuit court should be reversed and the cause remanded, and the Commission so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed and the cause remanded. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.